Good morning, Your Honors. Carrie Gordon, Federal Defenders, on behalf of Mr. Salazar-Lopez. Your Honors, there are two instances of error requiring reversal in this case. The first issue deals with the official restraint issue at trial. The second issue in this case is the indictment's failure to allege the deportation date, subjecting it to structural error and requiring reversal as well. Dealing with the official restraint issue first, as this Court is well aware in Pachanko-Medina, an entry is first required before a conviction for a found-in 1326 offense. And if an individual is under constant surveillance, they are not free to roam within the United States, and they wouldn't be subject to a 1320 — 1326 found-in offense. Essentially, it's the government's burden of proof here to prove that Mr. Salazar-Lopez was free from official restraint in this case. And the evidence presented at trial does indicate that Mr. Salazar-Lopez was under constant surveillance from the time that he entered the United States. If you look at the testimony of Agent Garcia, beginning at the end of the trial, the jury was instructed on this question, were they not? That is correct. The jury did receive an instruction on this. So we approach this question not from the perspective of was there evidence supporting your theory, but rather from the perspective of was there evidence supporting the verdict which the jury reached in the government's theory? Well, that is correct. It is — there was a Rule 29 motion brought, and the test would be sufficiency of the evidence. Any rational trier of fact could have found the evidence beyond a reasonable doubt. How accept is it given there was evidence in the record that supports your theory? What I need for you to address is, is there an absence of evidence supporting the government's theory? Because I think I found evidence in the record supporting that theory, too. And the jury is entitled at that point to choose either one. Well, at this point, if you look at the record, Agent Garcia did testify that he received a radio call stating from another Border Patrol agent who was watching the border at the time that seven people had just immediately crossed into the United States. The scope operator was watching those individuals and relaying that information back to Agent Garcia. It is true that Agent Garcia did later testify that there was a sensor alert. That's what the alert itself then basically alerted the scope operator that those people were coming in. So what we have here is we have an ambiguity. We have one only one. When was the first detection in relation to the border itself? Where would they have had to be when the first detection was picked up? To be free from official restraint, they have to... No, that's not my question. My question is physically, what's the evidence show? You're giving me the legal standard. I want to know what the facts are that you just recited the sequencing. I want to know where in relation to the border did the first trigger occur that alerted any agent that somebody was going to be illegally entering into the United States. That is unclear from the record. We do not have a specific location where the sensor had alerted at that point. That's not clear from the record. So we don't know whether they were inside tiptoeing on the border or tiptoeing up to the border? Well, we do know that the sensors are on the United States, the United States side of the border, which would indicate Agent Garcia did give conflicting testimony because at first the testimony was that he received evidence that the individuals had just crossed the border and were heading north. Subsequent to that, Agent Garcia also testified then that it was a sensor alert that triggered the individual who's watching the border who alerted that to him. But what you have here is you've got. The sensor being that somebody triggered it. Correct. Not who triggered it. Correct. That there was a sensor alert. But what we have here is we've got only one Border Patrol agent called on this issue, and it was Agent Garcia. And what we have is we've got ambiguity that the government introduced through their own witness. Now, this ambiguity could have been solved by calling, say, the scope operator to find out the exact details of what happened. But the government didn't do this. And so by raising the issue through their own witness, they created reasonable doubt here. And without testimony from the scope operator, the jury really had no basis to conclude that Mr. Salazar-Lopez was free from official restraint given the reasonable doubt introduced based on the testimony of Agent Garcia. Well, there's even a question short of that, because I'm not sure that being detected by a sensor is the kind of observation or continuous surveillance that's even required to qualify for the official restraint doctrine. All the sensor can say is something's moving there. Can't say what it is. Can't even say it's a human being. But it gives the agents reasons to look. Well, they go look, but by that time, there's little question, because the sensor's on the U.S. side of the border. They're likely not going to find that out until somebody's crossed the border. Now, it may be real fast that they can find it, but at least there's this gap between crossing the border and finally being spotted by somebody that even if the sensor's going crazy, I don't know that you can say that person is under official restraint. Well, we do have evidence from the record indicating if you look at excerpt of record page 83 and page 88 as well, Agent Garcia did testify that this area is desert. That it's remote. There's few bushes around that area. But importantly, to address your question that it's open wouldn't matter if nobody's looking. And nobody's looking until after the sensor goes off. You can't say that for sure, because there is testimony from Agent Garcia that there are several Border Patrol agents who do have binoculars whose job it is specifically to watch the border. Yes, there's sensors as well. Has anybody inferred that every part of the border is under observation all the time? But there is evidence to indicate that there are Border Patrol agents who are using, at night they use infrared detection, during the day they use binoculars, but we don't have testimony here. We do have testimony that there are people watching the border. So, can I just summarize then, at least from my understanding. What you're saying is that Garcia said sensor plus video cam plus alert and all of that so that it created the likelihood, not certainty, but the likelihood that some agent, individually or collectively, always had this group under surveillance from the time they came across the border. That is true. You didn't have to dispel that. That wasn't enough to eliminate reasonable doubt that they were under constant surveillance. That is correct. And given Agent Garcia's initial testimony that he received a radio call stating that seven individuals had just crossed the international border. And if we're heading north in his direction, indicates that he received that information from another Border Patrol agent who was watching at the time. Otherwise, they wouldn't be able to tell that the individuals had just crossed the international border. So, we do have evidence that here, Mr. Salazar-Lopez was under official restraint at the time. Your Honor, if there are any further questions. Thank you. With respect to the indictment in this case, because there was no date of deportation alleged in the indictment, the error was structural, thus requiring reversal. Here, the indictment only What's the authority for that proposition, that it's structural error? That it's structural error. This Court held under DuBose that an indictment's failure to recite an essential element of the charge is subject to structural error. And that's pre-apprendice. That is correct. But taking a look at this Court's holding in Covey and Sandoval, Covey and Sandoval found that the date of deportation in the 1326 is an element of the offense and thus subject to apprendee rights. But also found that it was not plain error, so it didn't determine that the error identified there was a structural error. That's true here, but going back to DuBose again, if you take a look at the Supreme Court's decision in Cotton. The drug quantity was erroneous, was a mistake under apprendee, but the Court did subject that to plain error. But the problem with Cotton We have to follow? No, Your Honor. Cotton didn't overrule DuBose in this case. What happened with Cotton is in Cotton, they didn't object to the indictment not alleging the drug quantity here. But what we have here is we do have a properly timed objection to the indictment. Now, when the indictment was first When was the indictment? When was the objection stated? The objection was stated prior to sentencing. If you take a look at the indictment in this case, it does not allege a date of deportation. Therefore, it was an indictment under 1326a, which subjects Mr. Salazar-Lopez at that time to a maximum penalty of two years in custody and one year of supervised release. Here, there were pre-sentence report PSR objections filed, and they were they were timely, given that the government didn't move to enhance the sentence until the pre-sentence report in the time of sentencing. So in response to the government's move to enhance the sentence, Mr. Salazar-Lopez then timely objected under Apprendi and Blakely, stating that the maximum time in custody was two years and one year of supervised release. I'd like to reserve any remaining time. Thank you. Thank you. Good morning. May it please the Court. Christopher Tenorio for the United States. Regarding the first issue of official restraint, make clear that there was no ambiguity regarding the testimony of the agent. He testified seven times that the scope operator was alerted to the presence of the agent supposedly crossing the United States after the censor had gone off. And the censor, we don't know exactly where the censor is. We don't. However, I think it's more than reasonable for a juror to conclude that they are on the United States side. And in addition to that. Is there a reason you all don't establish that as a matter of fact, rather than just letting us guess? I think it is just one of those things that was such a reasonable and obvious inference that it went unsaid. That's why we're spending so much time on the issue. Right. And we will show that more next time. However, there was also further evidence that Mr. Agent Garcia went and tracked individuals, including the appellant, and found him hiding in bushes. And there was further testimony that even if there was a camera operating, there were areas where it could not see, including behind bushes and other low areas. So there was certainly sufficient evidence for the jury to find that he was not under constant surveillance. Well, does our case law require that they be in visual sight the entirety of the time? Or is it that they can drop below a hill, but, you know, I mean, a little rise and then appear within 30 seconds? I think the only case that has addressed that has said if they're out of sight for a split second, they're still under constant surveillance. A split second is almost nothing. Right. I know we're on the slippery slope. I'm not making a pun. I'm just trying to. It's true. If they walk, you know, and they walk behind a little hillock in the desert, you know, so that seven are here, they walk behind the little hill, and they're out of sight for 10 seconds, and then they pop, and then the same seven are walking, you're saying no longer under official restraint? Right. Well, I think that it certainly would be dependent on the case. But I don't think that we need to worry about here, because at the initial point, when they crossed over, they were not seen. And at least there's sufficient evidence in the case that does. I mean, they weren't seen. Somebody was seen. Somebody was detected, but it wasn't they. Correct. It was they. That's correct. And we don't have any evidence of that. And in the Bayo Bahena case, the facts were even more ambiguous as to whether the scope operator kept constant surveillance. Well, who should have the burden as to, you know, I'm just trying to understand how this case sets up, this and other cases. The government has sensors that detect. It goes off for a single group, presumably. It can know whether or not it had multiple detections or a single detection, a single trip. But the report was it was a group of seven. So somebody, and that was off of, was that off the sensor? No, it was. That was the scope. The scope operator. Okay. So somebody alerted that something has come across the border. Correct. Okay. And what's the defendant supposed to do to establish or attack the government's case that you didn't have him under constant surveillance? If all he has to say, well, the sensor was triggered. Right. That's probably indisputable fact. Right. Where does that get the defendant if you're saying, well, that's all it takes? I think the government's burden is met where we prove some kind of evidence of the voluntary entry. If they're attacking the issue from the argument that they were under constant surveillance, they would have to call the scope operator or someone that would say that they were seen from the moment they entered until they were arrested. In this case, that person was available because it did not happen. I think the government did meet its burden as far as showing the entry, the voluntary entry, and that there was no evidence that it was constant surveillance. Was there any quantification of the time between when the sensor went off and the scope operator turned on the camera? No. Other than shortly thereafter. It could have been seconds. It could have been minutes. There's no evidence in the record that clarifies that. Correct. That's right. Even if it were a split second, however, the fact that the sensors, the reasonable inference is that those are in the United States. Even if they went there immediately, they still would not have seen the crossing into the United States. Any evidence as to where the sensors are in relation to the border or where the camera is in relation to the border? I don't believe there was. We know it's in the U.S. We don't know how far. Correct. It could be six inches. It could be six feet. It could be a mile. Correct. There was only evidence as far as how far the scope could see. Regarding the second issue of the alleged infirmity of the indictment, what the appellate would have you do is expand the scope, the reading of Covian. They want Covian to say not only must you charge the deportation in the indictment at the grand jury phase, but also the date. And there is no indication of other authority that supports that argument. In fact, to the contrary. What we have is, after Dubot, after Covian, we have this Court stating in Zepeda that it is not structural error. It's a harmless error test that you imply from neither. Now, the appellant brings up a couple of points that after the neither test of harmless error, there were questions regarding the contours of that test. Well, that was addressed in Zepeda, subsequent to neither. That at least in the context of a sentencing element, it's the harmless error, plain error standard that applies. And furthermore, because we do not have to allege the particular felony, if there is a felony after which the person is deported, because we do not have to allege the felony at the grand jury stage, it would not be necessary. In fact, it's irrelevant when the actual deportation date was at that stage. All we do is we charge that there was a deportation and this person has returned to the United States. And there's no other indication that the date, the specific date is necessary. In fact, this Court has continued to hold that where the overwhelming and uncontroverted evidence shows that the jury could only have found a particular deportation removal, the district court can find the date and note that the sequence of events puts that deportation subsequent to the felony. Kennedy. Were there two removals at issue in this case? No, there was not. And it was a little bit ambiguous from Appellant's brief. What the government did was prove the order of deportation in 2002, all the due process requirements, and show that they were met. And then the removal pursuant to the reinstatement in 2005. But there were two. Two deportations slash removals. One before the conviction and one after the conviction. But the difference was the physical removal. The only physical removal that was proven was the latter. That is when there was testimony of the detention enforcement officer who came and testified, recognized his signature on the later warrant of removal, indicating that he physically saw the person. What does the jury understand about the first order of deportation? Just that the paperwork had been done. And they couldn't have assumed that that meant he then was deported from the United States? Well, that was not argued. Not argued. But it certainly was a logical inference, wasn't it? Well, not quite, because what happened was the evidence of what happens after you get a warrant of deportation did not occur until we brought in the witness addressing specifically the 2005. Okay. But we did go through to show that all the elements were done. So with that, if there are no further questions, I'll submit. Okay. Thank you. Thank you. Thank you. Just briefly, Your Honors. With respect to the issue of official restraint and the burden of proof, United States, the government carries the burden of proving that the defendant was free from official restraint. So it is the government. I know that. I do understand. I'm just trying to figure out how they carry the burden. What would you have had them do in this case? They would have had to call the scope operator, because we do have testimony from Agent Garcia that he did receive information at 7 p.m. Your reliance is that he said, okay, censor, scope operator, there's no evidence that the scope operator didn't have them under constant surveillance until Garcia then gets into the tracking. So that's the constant surveillance. That's correct, Your Honor. Okay. Thank you. And with respect to the indictment challenge here, DuBose is good law, and DuBose did hold it in indictment's failure to recite an essential element of the offense. Your argument that DuBose is good law, your reply brief cited Cotton. Cotton was held up by the government as the basis for saying it's overruled DuBose sub salientio. Your reply brief never talks about Cotton in the context of DuBose. That's the question I tried to put to you earlier, and I don't think you've answered that question. Why hasn't Cotton satisfied or shouldn't satisfy us that the Supreme Court is saying this kind of problem? The difference about Cotton is it speaks of an indictment  Our other precedent makes clear that apprendi airs are subject to harmless air. You're raising the twist of an indictment, but Cotton speaks about an indictment and still applies a harmless air test. Right. But the problem is, in that case, the defendant didn't object to the indictment in Cotton. Therefore, they were just left with a plain error review standard. But if the Court can apply a plain error, I mean, I don't understand how that says it's not a structural error. Why that doesn't say it's not a structural error. A structural error is a structural error. But the Court didn't go down the structural error road in Cotton. To the missing piece of the indictment, it said that's subject to plain error review. Right. The Court didn't raise it, but it wasn't properly objected to by the defendant in that case. Therefore, the Court didn't address the issue, and they were just subject to it. You're saying they didn't raise the structural error point? They didn't object to raising the structural error point. That is correct. They didn't object to the indictment being flawed under structural error. They didn't preserve the issue. Therefore, the only standard that the Court could apply in that case was plain error. Okay. Okay. All right. Thank you very much. Counsel, we appreciate the argument on both sides. Thank you, Your Honor. And I don't say that if we don't mean it. I may say something like that. Anyway, I mean it. Thank you. Okay. We will take a short recess. All rise. Court is in recess for approximately five minutes. Thank you. Kelly is next. Kelly v. Provident is next. Thank you. Thank you.
judges: Fisher, Clifton, Fogel